Good morning, Your Honors. May it please the Court. Shannon Clark on behalf of Plaintiff Appellant Pablo Izaguirre. I will try to reserve approximately three minutes for rebuttal. I can tell from the previous two arguments that the panel has read the briefs and is very familiar with the facts and nuances of the case, so I will try to focus my time this morning on, obviously, answering any questions the panel has of me or my client, but also the case itself. You said in your brief, and I take it to be the case, that you do not challenge the regulation itself. That is correct, Your Honor. Either facially or as applied to your client. That is correct. So your claim is that the corrections officer violated the regulation. Essentially, yes. He failed to follow that regulation. Yes. It was Mr. Izaguirre contends that because of a long history of personal animosity between the two arising from a prior conflict they had, Correctional Officer 2 Moreno essentially falsified the forms, marked the excesses, disposed of the property, and never provided my client the opportunity to actually comply with that regulation and get his test. So if the client had and pursued a grievance procedure, I think he made three of them. And neither then nor to this day has he ever made any showing that those materials qualify under the regulation. So what difference does any of it make? The difference, Your Honor, and that's a good question, and I think there's some But essentially, he never attempted to make that showing when, according to my client, when the corrections officer told him that these had been confiscated, he had to do it. No, no, no. After that, he immediately grieved it. Right. And he followed it up the grievance ladder, each time asserting that, well, Moreno would – that he didn't have his books. He wanted his books. Correct. There's a question. He wanted his books. And the officials kept telling him, well, show us. You've got 90 days. I don't know where that comes from, by the way. And if you know where the 90 days comes from, I would appreciate your telling me. But anyway, they all seemed to recognize that it was 90 – that he had 90 days. And he never showed it, then or now. What happens is Mr. Izaguri grieves the fact that his books have been taken from him. He is told – told, according to our inquiry – He does not grieve that the books have been destroyed at that point. He simply says they've been taken from him. I haven't gotten my books yet. That's correct, strictly speaking. However, dealing with this pro se inmate litigant, it is very clear from all of those grievances that he is talking about, wait a second, I'm telling you these books are gone, they've been destroyed. I don't know why correction officers – why they're telling me I need to fill out this form, even within 90 days. Officer Moreno is telling me that I have no chance of getting these books back. They were gone. I just – they were destroyed long ago. So by the time he is working his way up through this grievance process, his understanding, based upon what Officer Moreno is telling him – and again, this is a fact we have to assume for the purposes of summary judgment – is that those books are long gone. It would be futile to prove that they came from an authorized source only to find out, hey, they're gone. Let me try it a different direction. Okay. Suppose – I mean, we take it as true. He destroyed the books. Right. If the books are contraband, they were going to get destroyed anyway. He had no right to the books. Unless they came from a qualified publisher or retailer, he had no right to the books, even though the subject matter was religion. And I'm not – I'm not into quibbling now as to whether it was central or whatever. Just because the subject matter was religion, if he had no right to those books under the regulations, what difference does it make that they were destroyed? What Mr. Izaguirre's position is, is that he did – he would have been able to make that requisite showing that this was a well-recognized place within his – I'm not saying he did make that showing. I can see that he never filed anything saying these are from an authorized source. His position is that to do that, to spend money and time writing to these people, getting them to provide whatever documentation would have presumably – assuming that Mr. Izaguirre is correct on that matter. Despite the fact that the officials responding to the grievance told him three different times, you've got 90 days to let us know if these qualify. The person that Mr. Izaguirre is having direct conflict – communication with is telling him that these books are gone. So it really gets the question of futility. This is part of the same point. Can you help me understand the regulations? I mean, I read the regulations, and I've got the Regulation 1.6 that says, inmates may receive prepaid publications mailed directly from the publisher slash retailer. There's no mention in that regulation about from a religious organization. On the other hand, and I'm now on SER 37, I've got a memo to Mr. Izaguirre from CO3 Payne that says, for books to be authorized to enter this unit, they must be prepaid from the publisher, bookstore, or religious organization. Now, I couldn't find religious organization in the written regulations, but it appears that the regulation is administered such that if it comes from a religious organization, they're okay. That is my understanding. And again, from the record, it's unclear as to how that interplay chain works between the two, whether it's religious or authorized recognized publishers. The impression that Mr. Izaguirre had is that, you know, if he can establish that it is from a religious institution, and the conflict here between him and the Department of Corrections in this case was there was some concern that the name of that institution was actually an individual. So his understanding was, hey, this isn't an individual. It's this recognized place that provides Spanish-language literature to Muslims across the country. Kennedy. What are we supposed to do with a sort of an access-to-proof question? I hear loud and clear Judge Reimer's questions, which is to say, he seems to have done nothing in the sense of he didn't write to this organization asking them to provide evidence of what they are and so on. And as far as we can tell, there's no impediment to his having done so. Let me come at it from the other direction, though, and that is, I assume that if these books were from this organization, and that seems to be the, you know, the documentation we do have in the record has them as having sent the organization, and there are four books, I would think that within that package, there's going to be some sort of a receipt so they know exactly. So whoever has custody of those things knows exactly what's in there and knows exactly where they came from. That's true. That's not something that's been very central on this appeal. There is evidence in the record that at some point Mr. Izaguirre has contended that those routinely do come with that type of documentation, and that his concern was that the officer Moreno destroyed that documentation as well, just brought him the books, brought him the form, and then marked for it to be destroyed. There's nothing in the record that tells us, that gives us, say, a photocopy of the address on the outside of the package. There's nothing. All we have is the form that's filled out that gives the name Al-Hayyad and the address in Georgia, period. That's correct. And again, that, you know, the chip But that's just written by somebody in the office who fills it out, in the prison office. And to help you with this, I understand the panel's frustration with the lack of documentation on this. One of the pieces of this is that upon getting this motion for summary judgment, Mr. Izaguirre asked the Court to allow him to conduct discovery into that very issue. What happened? Who's got the box? Why wasn't there the form there? That request was denied by the district court on the basis that it was a qualified immunity case and challenging this regulation. Because your time is running, let's assume for purposes of argument, but it is an assumption. Let's assume that you can survive summary judgment in terms of what Officer Moreno did. That is to say that Officer Moreno, because he wished to — because he was — because he was having personal difficulties with this particular inmate, destroyed property that, under the regulations, Mr. Izaguirre was entitled to have. Let's assume for purposes of this question that that's so. Why is he not entitled to qualified immunity on the ground that this — he could not — it was not unreasonable for him to think that maybe he was not interfering with either the First Amendment right or the statutory right. He's not entitled to — He's not — it's not interfering with the constitutional right to be mean or even to destroy property. That's not the allegation. What the allegation here is interference with religious exercise. Right. And it certainly would be our position that he did, you know, the allegations in Mr. Izaguirre's affidavit, the other places in the record where he talks about the central importance of these particular books to his practice of his religion. He does not know how to conduct his prayers or interpret the Koran without these particular books. And what's the governing law as to how much practicing of religion that a prisoner is required to give him, how clear was that law, and how much, then, can we hold Officer Moreno for having known it? I think it's pretty clear and would have been clear to Officer Moreno that, you know, this is core constitutionally protected speech, and just denying him that speech without a legitimate penological interest would violate both the First Amendment and later on the Religious Land Use and Institutionalized Persons Act. So I think that much is clear where those – and I don't think we get into that inquiry of how much of that, on a quantitative basis, he has to get into. I mean, he can't just willy-nilly deny core protected speech to a person without a legitimate interest, which even the existence of this very regulation, having a procedure for protecting that speech and those materials is essentially evidence of the protected nature of that. So that would be our position. Thank you. Thank you, Mr. Clark. Ms. Hoffman. Good morning. I'm Wanda Hoffman. I'm an Assistant Attorney General for the State of Arizona, and I'm representing Officer Moreno here today. Well, you took the sting out of my argument, Judge Reimer. That's my – that was my opening point. Well, there's no question it would be a violation of his First Amendment rights if Moreno destroyed religious materials, right? I mean, that's just unarguable. If it was outside the policy on … Well, no, forget the policy. I mean, the policy is the policy, but he's – they are religious materials, and Moreno just says, heck with the policy. I can't stand this guy, and I think he's a terrorist, and so I'm going to throw away his dag-gum books. Officer Moreno was guided by the policy, which is constitutional. Well, apparently he was. If we accept it's true that he destroyed the books right away and the policy says keep them for 90 days, he wasn't guided by the policy. And, in fact, Petitioner keeps getting responses to his grievances that say, fill out the form, you've got until such-and-such a date, and, indeed, the forms make reference to how Officer Moreno has graciously agreed to wait until that date. So if, in fact, Moreno had destroyed the books and he's not telling his supervisor that that's what he's done, he couldn't be defended by a policy, could he? Well, the policy itself is legitimate because under – is it – now I'm forgetting the name of the case, but there is Supreme Court's precedent to say the publisher-only rules are legitimate under the Turner v. Safley. No, but if Moreno rewrites the policy himself. Exactly. Well, what I'm saying, if he did comply with the policy, if he waited the 90 days, as far as he could. Well, what if he destroyed the books? I mean, the allegation now is that he didn't wait 90 days. He destroyed the books. And the reason that plaintiff didn't fill out the form and so forth and get the authorization is because they knew it was futile. If that's the allegation, is Moreno entitled to qualified immunity? Well, I would say that that's more of a question. However, under Resnick v. Adams, this Court ruled that a plaintiff has a substantial burden or a substantial – has to substantially provide substantial evidence of futility. And for one thing, in Resnick, Mr. Resnick did not complete an application to receive a kosher diet. And similarly, in this case, Mr. Isagiri did not put up the documentation necessary. Also, in order to overcome summary judgment, Mr. Isagiri had the burden of showing enough evidence to convince a jury that the documents or the books had been destroyed before the three-month period was up. And just to go back to that for a second, at SER 0033, Your Honor, is where the policy states that an inmate has 90 days to notify designated staff of the desired disposition What was that number again? SER 0033. Thank you. And I'm on that page. Where on that page? It's Section 1.2.2, about two-thirds of the way down. And if he fails to do so, the property shall be processed as unclaimed property. Now, let me read that to you. It says the inmate has 90 days to notify the designated staff of the desired disposition. If the inmate fails to do so, the property shall be processed as unclaimed property and disposed of. It doesn't say that we dispose of it after 90 days. If he notifies within 90 days, this regulation doesn't speak to when it's going to be destroyed. It says on the property form itself, the contraband release form, it states the date that the disposition will take place. So it was notified on it. And where is that then? Let me see that. That is presented with the ER67. That's right here. It doesn't say what she says it says. It says right here on the same property. It's disposed on. It's the other side. What page are you on now? It's in here. Okay. It is at ER67, correct, property to be disposed of on 511-02. But, of course, that doesn't tell us anything except that's what somebody filled in. That is to say, as the preprinted form says, property disposed of on, and then there's a blank. It's then filled in, 511-02. Well, that doesn't tell me that the regulation says we dispose of the property within 90 days. The regulation that we just read says you have to notify within 90 days, and it says nothing about when it will be disposed of. Well, no. The other regulation also says that within three business days, the inmate is to be notified the contraband property has arrived. And that's the point. Yeah, but that doesn't talk about when it's destroyed. And the regulation you point to, the 90-day regulation says the inmate must notify within 90 days. That's all it says, at least so far as you've pointed us to a regulation. That's all that regulation says. It's interpreted in a way to mean that it will be destroyed on the date in which it is, where it's ‑‑ Do I take it that the prison officials interpret the regulations to mean that, you know, if what appears to be contraband comes into the mailroom, they let the inmate know that contraband has arrived, but that the inmate, which is destroyable. I mean, if it's contraband, it can't come in. But they give the inmate 90 days to let him know whether to send it back, which the inmate would have to pay for, or whether to throw it away, which the inmate would not have to pay for, or to show that it really and truly isn't contraband. Have I said that right? Yes. Or to donate it. There are three choices. But this isn't anywhere in writing. But, I mean, that's the way it's interpreted. But the way that the ‑‑ and this is in the record also, that when he wrote to his counselor, Correctional Officer 3, Payne, Payne wrote back to him and said, we're not going to destroy it. I spoke to Officer Moreno in the mailroom, and it will not be destroyed. He didn't specify that he should come up with the documentation. However, when Mr. Isagiri filed a formal grievance after that, Officer Frydenmaker wrote back to him and explained to him it wasn't apparent on the envelope that this was ‑‑ it appeared to come from an individual. It needed to come from a religious organization, and you have until the disposition date in order to come up with documentation to that effect. And I believe that the deputy warden, the second step of the grievance process, third step, actually, when he appealed it, also said the same thing, before the destruction date. So he was told several times that this is what he needed to do. Kennedy. You know, I've got ‑‑ the further I get into this, when the tangleder I get, I'm now looking at the form on 0067, that's the notification of the inmate, and it says quantity for, and then just as it gives one of the titles, and it says contraband. And then it says in parenthesis, not sent from publisher. Well, can you help me out as to whether or not it's permissible if it's sent from a religious organization? That's what's in the written memo from Payne, that it's okay if it's sent from a religious organization. This merely says not sent from a publisher. Correct. And this is a mailroom officer handling hundreds of ‑‑ Right. And I understand. I'm not expecting the mailroom officer necessarily to ‑‑ I mean, this is not a sworn affidavit. This is just a form. Absolutely. And I think this was just the shorthand that that's what it refers to. It didn't come from an appropriate source, an authorized source. Do we have anything in the record from anyone who actually handled these materials that tells us that there was nothing in that package indicating that it came from a religious organization? We do not. And why don't we have that? Wouldn't that be useful to know? And wouldn't it be very easy for the prison authorities to have stated either in the grievance procedure or the district court if it were true? Does anybody know who Al is? I couldn't find him, but ‑‑ Well, wait a minute. There's something in the record that has the name of this organization and clerks in Georgia. That's what Plaintiff alleges, but there's nothing ‑‑ No, there's a Yellow Pages Internet search that has it down at the bottom. And I'm a little unclear as to where it came from, but it's in the record. There was a Yellow Pages search of a place where the Koran came from in Tucson, I believe, which showed a street address. And Mr. Isagiri argued that he was not permitted to have his Koran, and I believe that's ‑‑ that was to show that this was a source that was easily identifiable, whereas Al Hedaya was not. It was from a P.O. box in Clarkston, Georgia. And it's apparent from the record that everybody, all the officers who dealt with this problem, thought this was an individual. Thank you very much. Actually, if I could ask one more question. They thought this was an individual named Al. Is that your argument, that they thought this was like Al Gore? It appears that way. But that's inconsistent with what the inmate says when the inmate says that Officer Moreno is talking to him about being a terrorist. And it was right after 9-11, everybody knows Al Hedaya, to suggest with a straight face that it's not a disputed fact, that they thought that this was somebody named Al. I have to say that that ‑‑ to survive a summary judgment on the ground that they thought it was from an individual named Al, that one doesn't win it for me. It could have been. Well, it could have been, but it seems to me unlikely. For qualified ‑‑ And at least it's a disputed fact. A disputed fact as to what was in their head. Qualified immunity as to whether or not, once they know, once we can decide whether or not they thought it really was from Al Gore, well, at that point, we can decide whether they thought that it was protected activity, which is, I think then, okay, that's qualified immunity. But that's a disputed fact. I don't see how we can get around that being a disputed fact. I think what the Court has said is that if the ‑‑ if an officer reasonably could have believed, even if it was wrong, even if his belief was wrong, if he reasonably could have believed. But my question is, and my point goes, is I think it's entirely possible on this record to say, to conclude. It may or may not be true, but it's entirely possible on this record to conclude that the officer did not believe it. He might have said it, but he didn't believe it. Mr. Isagiri made a point of saying that he showed this ‑‑ this form to the grievance coordinator, Officer Frydmaker, and he told ‑‑ he showed her the form and he said, obviously, this is from a Muslim center. This is not from somebody named Al. And he made that point to her, and when she wrote back to him, she said it appears to be from an individual. So that was her perception as well. And if she could have believed that, she was an officer, also, I think it's reasonable. Thank you very much. Thank you. Roberts. Sorry to hold you up. I believe I had 34 and 19 seconds. But since the panel is asking questions about what is and isn't in the record, I do just want to briefly address the fact that Mr. Isagiri truly was blindsided by the Court's ruling. He was ‑‑ he got a motion that talked about qualified immunity based on this regulation. He writes back saying, wait a second, I'm not challenging the regulation. I thought that it should have complied with it. Nowhere is he given any sort of fair notice under the Rand decision that he had to come forward with evidence detailing exactly how Officer Moreno's conduct substantially burdened his religious exercise rights. He talked to ‑‑ he luckily put some of that in the record. But as far as the Court's finding that he didn't have evidence about his ability to worship with services, talk to other inmates, that kind of stuff, nowhere was he given notice that he had to come forward with that type of evidence. So, again, no discovery, no fair notice. All of these things militate in favor of reading the record liberally in favor of this prisoner. Thank you for your time. Mr. Clark, a matter just argued will be submitted.
judges: Rymer, W. Fletcher, Clifton